FIFTH DIVISION
March 30, 2007

No. 1-06-2326

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| LORILLARD TOBACCO COMPANY; PHILIP MORRIS | ) | Honorable |
| USA INC.; R.J. REYNOLDS TOBACCO COMPANY, | ) | Dennis J. Burke, |
| INC.; COMMONWEALTH BRANDS, INC., | ) | Judge Presiding. |
| DAUGHTERS AND RYAN, INC.; FARMERS | ) | |
| TOBACCO COMPANY OF CYNTHIANA, INC.; | ) | |
| HOUSE OF PRINCE A/S; JAPAN TOBACCO | ) | |
| INTERNATIONAL U.S.A., INC.; KING MAKER | ) | |
| MARKETING, INC.; KRETEK INTERNATIONAL, INC.; | ) | |
| LIBERTY BRANDS, LLC; LIGGETT GROUP LLC; P.T. | ) | |
| DJARUM; PETER STOKKEBYE TOBAKSFABRIK A/S; | ) | |
| SANTA FE NATURAL TOBACCO COMPANY, INC.; | ) | |
| SHERMAN 1400 BROADWAY N.Y.C., INC.; TOP | ) | |
| TOBACCO, L.P.; VIBO CORPORATION, d/b/a General | ) | |
| Tobacco; VIRGINIA CAROLINA CORPORATION, INC.; | ) | |
| and VON EICKEN GROUP, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

JUSTICE GALLAGHER delivered the opinion of the court:

The State of Illinois (Illinois) filed this interlocutory appeal, pursuant to Supreme Court

Rule 307(a)(1) (188 Ill. 2d R. 307(a)(1)), from an order of the circuit court of Cook County,

which, among other things, compelled arbitration of the instant dispute between the parties. We

affirm and remand.

BACKGROUND

Several years ago, Illinois, as well as other states and jurisdictions, filed suit against several tobacco manufacturers based upon alleged wrongdoing in the marketing and advertising of their cigarettes. Illinois alleged, *inter alia*, that the manufacturers had defrauded the public by concealing evidence of smoking's adverse health effects and by affirmatively misleading the public with medical research reports. Illinois sought to recover the billions it had spent on health care for its residents with smoking-related illnesses.

On November 23, 1998, the defendant tobacco manufacturers entered into a Master Settlement Agreement (MSA) with 46 states,[1] including Illinois, as well as the District of Columbia, Puerto Rico, the U.S. Virgin Islands, American Samoa, the Northern Mariana Islands, and Guam. Although not all states, these settling entities are referred to as Settling States in the MSA. The Settling States agreed to dismiss their lawsuits and release past and future claims in exchange for annual payments from the tobacco manufacturers, as well as several other concessions, including marketing and advertising restrictions. The instant case involves the annual payment due for the calendar year 2003.

Originally, only the four largest tobacco companies, defendants Philip Morris, Inc. (Philip Morris), R.J. Reynolds Tobacco Co., Inc. (Reynolds), Lorillard Tobacco Co., Inc. (Lorillard), and a fourth company, Brown & Williamson, entered into the MSA. In 2004, Brown & Williamson merged with defendant Reynolds. As the first tobacco companies to enter into the MSA, Philip

---

[1] The tobacco companies and four states, Florida, Minnesota, Mississippi, and Texas, entered into separate individual settlement agreements.

Morris, Reynolds, and Lorillard became known as "original participating manufacturers" (OPMs). The MSA permitted other tobacco companies to join into the settlement in order to avoid future litigation. Many did so and became known as "subsequent participating manufacturers" (SPMs). The remaining defendants in this case, Commonwealth Brands, Inc.; Daughters and Ryan, Inc.; Farmers Tobacco Co. of Cynthiana, Inc.; House of Prince A/S; Japan Tobacco International U.S.A., Inc.; King Maker Marketing, Inc.; Kretek International, Inc.; Liberty Brands, LLC; Liggett Group LLC; P.T. Djarum; Peter Stokkebye Tobaksfabrik A/S; Santa Fe Natural Tobacco Co., Inc.; Sherman 1400 Broadway N.Y.C., Inc.; Top Tobacco, L.P.; Vibo Corporation, d/b/a General Tobacco; Virginia Carolina Corp., Inc.; and von Eicken Group are SPMs. Collectively, the OPMs and SPMs are referred to as participating manufacturers (PMS). Those tobacco companies that did not enter into the settlement are known as non-participating manufacturers (NPMs).

The MSA requires the PMS to make annual payments that are intended to help the Settling States achieve "significant funding for the advancement of public health measures" and "the implementation of important tobacco-related public health measures." The PMS do not make payments directly to individual Settling States. Rather, each PM is required to make a single, nationwide payment into an escrow account on April 15 of each year, which is then allocated among the Settling States. The PMS' payment obligation is calculated and determined annually by an "Independent Auditor." The MSA provides that "[t]he Independent Auditor shall be a major, nationally recognized, certified public accounting firm." Currently, the Independent Auditor is PricewaterhouseCoopers.

1-06-2326

The MSA contains a comprehensive formula for the Independent Auditor to use in determining the PMS' annual payment obligation. The starting point is the aggregate base payment obligation for all OPMs set forth in the MSA. This amount is then subject to several adjustments. One of these adjustments is the "Non-Participating Manufacturer Adjustment" (NPM Adjustment), which is at issue in the present case.

As noted earlier, NPMs are tobacco companies that have not joined the MSA. Therefore, these NPMs – unlike their PM competitors – are not subject to the MSA's marketing restrictions and payment obligations. The drafters of the MSA recognized that the marketing restrictions and payment obligations could put the PMS at a competitive disadvantage relative to the NPMs and potentially cause PMS to lose market share to NPMs. Thus, the NPM adjustment attempts to level the playing field by reducing the annual payment obligations of PMS if, collectively, it is proven that they actually lost market share to NPMs. The threshold question is whether the PMS experienced a collective loss of United States market share of more than 2%, relative to their combined market share in 1997 (the year before the MSA went into effect). Without such a loss, the analysis ends and the PMS are not entitled to an NPM Adjustment. In the instant case, however, the parties do not dispute that the PMS experienced such a loss.

Where the PMS do experience an aggregate market share loss of more than 2%, the next step is for an economic consulting firm (the Firm) to determine "whether the disadvantages experienced as a result of the provisions of [the MSA] were a significant factor contributing to the Market Share Loss." If the PMS experience the requisite aggregate market share loss and the Firm also concludes that the MSA was a "significant factor" contributing to that loss, the MSA

4

provides that the NPM adjustment shall apply.

Even if an NPM Adjustment is otherwise potentially available to PMS, the MSA contains a way for a Settling State to avoid a reduction in payments. Specifically, the MSA provides that "[a] Settling State's Allocated Payment shall not be subject to an NPM Adjustment * * * if such Settling State continuously had a Qualifying Statute * * * in full force and effect during the entire calendar year immediately preceding the year in which the payment in question is due, *and* diligently enforced the provisions of such statute during such entire calendar year." (Emphasis added.) MSA §IX(d)(2)(B). The MSA additionally provides that "[t]he aggregate amount of the NPM Adjustments that would have applied to the Allocated Payments of those Settling States that are not subject to an NPM Adjustment * * * shall be reallocated among all other Settling States pro rata in proportion to their respective Allocable Shares * * * and such other Settling States' Allocated Payments shall be further reduced accordingly." MSA §IX(d)(2)(C).

The Present Dispute

The present dispute concerns the Independent Auditor's decision not to apply an NPM Adjustment to the PMS' April 17, 2006, annual payments. This litigation had its origins in early 2004, when certain PMS requested that the Independent Auditor offset the amount of the 2003 NPM Adjustment.[2] Certain SPMs did file suit in Connecticut and New York to compel

---

[2] At that time, the Firm still had not determined whether the MSA had been a significant factor in the PM's 2003 aggregate market share loss. In the instant case, by the time the Independent Auditor issued its Final Calculation for 2006 on March 29, 2006, the Firm had determined that the MSA was a significant factor in the PMS' 2003 market share loss. The

1-06-2326

arbitration. The courts in those states ultimately determined that the disputes were arbitrable under the MSA. See *State v. Philip Morris Inc.*, 279 Conn. 785, 905 A.2d 42 (2006); *State v. Philip Morris Inc.*, 30 A.D.3d 26, 32-33, 813 N.Y.S.2d 71, 76 (2006), appeal allowed, 7 N.Y.3d 716, 859 N.E.2d 921, 826 N.Y.S.2d 181 (2006). The dispute regarding the NPM Adjustment continued into 2006 and resulted in this litigation.

Under the MSA, each year, the Independent Auditor collects information from the parties. MSA §XI(d)(1). The Independent Auditor must then issue its "Preliminary Calculation" of the amounts due from the PMS at least 40 days before the April payment date. MSA §XI(d)(2). Specifically, the MSA requires the Independent Auditor to deliver to all the parties "detailed Preliminary Calculations *** of the amount due from each [PM] *** showing all applicable *** adjustments *** and setting forth all the information on which the Independent Auditor relied in preparing such Preliminary Calculations." MSA §XI(d)(2). Any party that disagrees with "any aspect" of the Independent Auditor's Preliminary Calculations may serve notice of its objections upon the other parties. MSA §XI(d)(3). The Independent Auditor reviews any objections and then issues a "Final Calculation," which must include an explanation of any changes made to the Preliminary Calculations. MSA §XI(d)(4). Again, the parties may serve notice of any objections they may have to the Final Calculation. MSA §XI(d)(6).

After the Firm concluded that the MSA was a "significant factor" contributing to the PMS' 2003 market share loss, the OPMs requested that the Independent Auditor offset the amount of the 2003 NPM Adjustment against their April 17, 2006, payments.

---

parties have raised no issue in this appeal regarding that determination by the Firm.

In response, the Settling States objected and urged the Independent Auditor not to apply the 2003 NPM adjustment on the same grounds on which it had relied in prior years, namely, that the Independent Auditor should "presume" diligent enforcement of their Qualifying Statutes.

On March 7, 2006, the Independent Auditor issued its Preliminary Calculation of the 2006 annual payment. The Independent Auditor did not apply the NPM Adjustment in its Preliminary Calculation. Thus, as requested by the Settling States, the Independent Auditor effectively presumed that the Settling States were diligently enforcing their Qualifying Statutes. The Independent Auditor defended its nonapplication of the 2003 NPM Adjustment until such time as the parties or a trier of fact resolved the dispute over the issue of "diligent enforcement" with regard to the Qualifying Statutes. The Independent Auditor explained that it was not charged with that responsibility nor was it "qualified to make the legal determination as to whether any particular State [had] 'diligently enforced' its Qualifying Statute."

As the Settling States further note, the Independent Auditor stated that its decision not to grant the NPM Adjustment was "[b]ased on the data available at this time" – *i.e.*, until it received "[a]dditional [i]nformation" in the form of some "[r]esolution of the question related to diligent enforcement of the qualifying statutes."[3]

On March 29, 2006, the Independent Auditor issued its Final Calculation and reiterated that it would not award an NPM Adjustment for 2003 until such time as the parties or a trier of

---

[3]Under the MSA, if any information necessary to calculate the annual payments is missing, the Independent Auditor must calculate the annual payments by employing an assumption or best estimate for the missing information. MSA§XI (d)(5).

fact resolved the dispute over the issue of "diligent enforcement" with regard to the Qualifying Statutes.

On April 10, 2006, the OPMs served notice that they disputed the Independent Auditor's final calculation. Nonetheless, the OPMs paid the full amounts calculated by the Independent Auditor on the due date of April 17, 2006. Reynolds and Lorillard, however, paid the sums attributable to the disputed amount into the "Disputed Payments Account" as provided in the MSA. MSA §§XI(d)(7),(8).

On April 19, 2006, Illinois filed a motion to enforce the MSA and the consent decree and for declaratory relief in the circuit court of Cook County. Illinois sought, among other things, a declaration that it had "diligently enforced its Qualifying Statute" and that "any NPM adjustment to Illinois MSA payments as defined in Section IX(d) [of the MSA] is inappropriate."

On April 20, 2006, the OPMs requested that Illinois arbitrate the parties' dispute pursuant to section XI(c) of the MSA. In their letter, the OPMs referred to the state courts in other jurisdictions that had already determined that the dispute was arbitrable. Illinois refused to arbitrate, noting that it had already filed suit over what it believe to be separate, nonarbitrable issues that would moot the issues raised in the OPMs' letter.

On May 2, 2006, the OPMs filed a motion to compel arbitration and dismiss the State's motion or, in the alternative, stay this litigation. The remaining defendants, all SPMs, joined in the OPMs' motion.

After briefing and oral argument, the circuit court, on August 8, 2006, granted the OPMs' motion to compel arbitration and stayed the case pending the outcome of the arbitration. The

circuit court concluded that the plain and unambiguous language of the MSA's arbitration clause required arbitration of the parties' dispute concerning the NPM Adjustment, including the State's diligent enforcement defense. On August 21, Illinois timely filed a notice of interlocutory appeal pursuant to Supreme Court Rule 307. 188 Ill. 2d R. 307.

ANALYSIS

The State correctly notes that this court has jurisdiction under Supreme Court Rule 307(a)(1) to review the circuit court's order granting Illinois' motion to compel arbitration. See *Salsitz v. Kreiss*, 198 Ill. 2d 1, 11, 761 N.E.2d 724, 730 (2001) ("order of the circuit court to compel or stay arbitration is injunctive in nature and subject to interlocutory appeal under paragraph (a)(1) of the rule").

The circuit court did not hold an evidentiary hearing and concluded that the plain and unambiguous language of the MSA required arbitration of this dispute. Thus, our review is *de novo*. *Cohen v. Blockbuster Entertainment, Inc.*, 351 Ill. App. 3d 772, 776, 814 N.E.2d 933, 936-937 (2004).

In each settling state, the court that approved the MSA and entered the corresponding consent decree is referred to as that State's "MSA Court." The MSA provides that each MSA Court "shall retain exclusive jurisdiction for the purposes of implementing and enforcing this Agreement and the Consent Decree." MSA §VII(a)(2). In Illinois, the MSA Court is the circuit court of Cook County.

The MSA, however, carves out exceptions to the MSA courts' jurisdiction, which includes, among other things, that which is "provided in subsection[] * * * XI(c)." MSA

§VII(a)(3). The interpretation of that subsection is at issue here and shall be referred to as the Arbitration Provision.

While arbitration is a favored method of dispute resolution, "parties to an agreement are bound to arbitrate only those issues they have agreed to arbitrate, as shown by the clear language of the agreement and their intentions expressed in that language." *Salsitz v. Kreiss*, 198 Ill. 2d at 13, 761 N.E.2d at 731.

The Arbitration Provision of the MSA states as follows:

"(c) Resolution of Disputes. Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge. Each of the two sides to the dispute shall select one arbitrator. The two arbitrators so selected shall select the third arbitrator. The arbitration shall be governed by the United States Federal Arbitration Act." MSA §XI(c).

We conclude that the clear language of the Arbitration Provision shows that the parties intended to arbitrate the present dispute.

Illinois argues, however, that the Arbitration Provision is a narrow exception to the MSA Court's broad jurisdiction. Although not binding upon this court, we note that courts in other

jurisdictions have almost unanimously concluded that the present dispute is arbitrable. We agree with those courts that have found the instant dispute arbitrable under the MSA's plain language.

One court, acknowledging that the arbitration clause does not encompass the entire MSA, nonetheless construed the clause as being "broad" due to its plain language that does encompass *any* dispute "arising out of" or "relating to" any calculations or determinations of the Independent Auditor. See *State v Philip Morris*, 30 A.D.3d at 31, 813 N.Y.S.2d at 75. Another court viewed the arbitration clause as "narrow" because it was a "substantively limited exception to the Court's otherwise exclusive power to hear and decide disputes as to [that State] arising under the MSA." *State v. Philip Morris, Inc.*, No. X02CV960148414S (Conn. Super. Aug. 3, 2005), slip op. at ___, *aff'd*, *State v. Phillip Morris, Inc.*, 279 Conn. 785, 905 A.2d 42 (2006). Nonetheless, the Court determined that the dispute was clearly covered under the operative language of the narrow arbitration clause. *State v. Philip Morris, Inc.*, No. X02CV960148414S (Conn. Super. Aug. 3, 2005), slip op. at ___, *aff'd*, *State v. Phillip Morris, Inc.*, 279 Conn. 785, 798, 905 A.2d 42, 49 (Conn. 2006) (explaining that "[a]lthough the agreement thus limits the subject matter of the disputes that are arbitrable, it employs broad language in defining the scope of the disputes that fall within that subject matter"). We conclude that, regardless of whether the Arbitration Provision is characterized as "broad" or "narrow," the plain and unambiguous language of the Arbitration Provision requires arbitration of the present dispute.

Illinois correctly notes that the Independent Auditor did not make a determination as to whether there was diligent enforcement of the Qualifying Statutes.[4] Thus, Illinois contends,

---

[4] It is undisputed that, in 1999, Illinois enacted a Qualifying Statute. See 30 ILCS 168/1 *et*

since there was no determination made by the Independent Auditor, there is nothing to arbitrate. We disagree. The present dispute does involve a determination made by the Independent Auditor. The MSA clearly provides that, in calculating the annual payments due, the Independent Auditor must make an initial determination regarding the applicability of any adjustments, including the NPM Adjustment. It is *that* determination that is in dispute in the instant case. The Independent Auditor's decision not to apply the NPM Adjustment was based upon its presumption – made at the Settling States' urging – that they were diligently enforcing their Qualifying Statutes. The determination that the NPM Adjustment should not apply clearly falls within the language of the Arbitration Provision.

Even if the present dispute does not involve a direct challenge to a determination made by the Independent Auditor, the dispute would still be subject to mandatory arbitration because the MSA provides that all disputes "arising out of or relating to" such determinations must be arbitrated. MSA §XI(c). We agree with the following succinct and clear analysis:

> "The Independent Auditor's decision not to apply the NPM Adjustment, and the dispute over whether that adjustment should have been applied, clearly 'arises out of' that decision and is certainly 'related to it,' thus making it a proper subject for arbitration pursuant to the plain terms of the MSA." *State v. Philip Morris Inc.*, 30 A.D.3d at 32, 813 N.Y.S.2d at 76.

Additionally, the Arbitration Provision further shows that the parties intended that the present dispute be arbitrable. The parenthetical phrase in the Arbitration Provision provides clear

---

*seq*. (West 2000)).

examples of disputes subject to arbitration as "including, without limitation, any dispute concerning the operation or *application of any of the adjustments*, * * * described in subsection IX(j)." (Emphasis added.) MSA §XI(c). Subsection IX(j) includes the NPM Adjustment. Thus, by the plain language of the MSA, the "application of any of the adjustments" constitutes a dispute that arises out of or relates to the Independent Auditor's determinations or calculations and is, therefore, subject to arbitration. We conclude that the circuit court correctly interpreted the MSA and the Arbitration Provision.

Moreover, we agree with those courts before us that have pointed out the "compelling logic to having these disputes handled by a single arbitration panel of three federal judges, rather than numerous state and territorial courts." See, *e.g.*, *State v. Philip Morris Inc.*, 30 A.D.3d at 32, 813 N.Y.S.2d at 76. As the New York court further explained:

"Since the granting of an exemption by one settling state will automatically lead to the reallocation of its allocated portion of the NPM Adjustment to all other non-exempt settling states, each governmental signatory has its own self-interest at stake in the outcome of this issue, which is necessarily in conflict with every other state. Such a result defeats the whole purpose of having a Master Settlement Agreement. The mechanism of submitting disputes involving the decisions of the Independent Auditor to a neutral panel of competent arbitrators, who are guided by one clearly articulated set of rules that apply universally in a process where all parties can fully and effectively participate, obviates this problem and ensures fairness for all parties to the MSA. To hold otherwise is contrary to both the spirit

and the plain language of the Master Settlement Agreement." *State v. Philip Morris Inc.*, 30 A.D.3d at 32-33, 813 N.Y.S.2d at 76.

While not essential to our disposition of this case, we agree with the PMS that the structure of the MSA's payment provisions compels arbitration. As the PMS note, the MSA imposes a single, unitary payment obligation on each PM based on its nationwide sales. We also agree with the statement made by one court that the MSA's "broad referral to an arbitration panel of '[a]ny dispute, controversy or claim arising out of' the independent auditor's calculations or determinations reflects the necessity of creating a uniform, nationwide set of rules by which the independent auditor is to calculate the annual payments." *State v. Philip Morris Inc.*, 279 Conn. At 800, 905 A.2d at 50. This is why the MSA carves out an exception to the MSA courts' jurisdiction for payment-related disputes in the Arbitration Provision (MSA §XI(c)).

In view of our decision that the plain and unambiguous language of the MSA's arbitration provision requires arbitration of the parties' dispute concerning the NPM Adjustment, including the State's diligent enforcement defense, we need not address the Illinois' public policy concern that favors arbitration.

For the reasons stated above, the August 8, 2006, order of the circuit court that granted the OPMs' motion to compel arbitration and stayed the case pending the outcome of the arbitration is affirmed. This cause is remanded for further proceeedings consistent with this opinion.

Affirmed.

O'BRIEN, P.J., and O'MARA FROSSARD, J., concur.

14

1-06-2326